100 N.Y.2d 159 (2003)
791 N.E.2d 941
761 N.Y.S.2d 576
SAMUEL DESIDERIO, an Infant, by His Mother and Natural Guardian, GALE ORGANIST, Respondent,
v.
ROBERT L. OCHS et al., Defendants, and
NEW YORK HOSPITAL, Appellant.
Court of Appeals of the State of New York.
Argued February 12, 2003.
Decided April 8, 2003.
*160 Phillips Nizer LLP, New York City (Stuart A. Summit, James S. Frank, Judith S. Roth and Jeffrey L. Shore of counsel), for appellant.
Kramer, Dillof, Livingston & Moore, New York City (Matthew Gaier, Thomas A. Moore and Norman Bard of counsel), for respondent.
*161 Eliot Spitzer, Attorney General, New York City (David Lawrence III, Daniel Smirlock and Michael S. Buskus of counsel), in his statutory capacity under Executive Law § 71.
*162 Fager & Amsler, Syracuse (Frances A. Ciardullo of counsel), for Medical Liability Mutual Insurance Company, Inc., amicus curiae.
Shaub, Ahmuty, Citrin & Spratt, LLP, Lake Success (Steven J. Ahmuty, Jr., of counsel), for FOJP Service Corporation and another, amici curiae.
Paul M. Duffy, New York City, Mauro Goldberg & Lilling LLP, Great Neck (Barbara D. Goldberg and Kenneth Mauro of counsel), and Fiedelman & McGaw, Jericho (Andrew Zajac of counsel), for Defense Association of New York, Inc., amicus curiae.
*163 Michael A. Cardozo, Corporation Counsel, New York City (Fay Leoussis, Pamela Seider Dolgow, Margaret G. King, Christina M. White and John Hogrogian of counsel), for City of New York and another, amici curiae.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Albany (Philip Rosenberg and Laurie T. Cohen of counsel), for Healthcare Association of New York State and others, amici curiae.
*164 Susan C. Waltman, New York City, for Greater New York Hospital Association, amicus curiae.
Jeffrey A. Lichtman, New York City, and Pollack, Pollack, Isaac & De Cicco (Brian J. Isaac and Brian Shoot of counsel) for New York State Trial Lawyers' Association, amicus curiae.
Chief Judge KAYE and Judges SMITH, WESLEY and GRAFFEO concur with Judge CIPARICK; Judges ROSENBLATT and READ concur in result in separate concurring opinions.

OPINION OF THE COURT
CIPARICK, J.
In Bryant v New York City Health & Hosps. Corp. (93 NY2d 592 [1999]) and earlier cases, we interpreted some of the "nuts-and-bolts" *165 calculations required by the structured judgment provisions of CPLR articles 50-A and 50-B. In this medical malpractice action, defendant hospital, by its insurance carrier, claims that the legislative intent that prompted enactment of article 50-A prohibits literal application of the statute when the resulting structured judgment might exceed the jury's future damages award. We disagree and affirm the Appellate Division order upholding Supreme Court's judgment.

I
Through his mother, plaintiff Samuel Desiderio sued the defendants, New York Hospital and several of its doctors, for malpractice that resulted in severe brain damage. Samuel was born with hydrocephalus and, in October 1990, underwent surgery to revise a shunt used to treat the condition. The shunt failed, putting pressure on Samuel's brain. After nearly three years of in-patient care, Samuel now breathes at home through a permanent tracheostomy and must be fed through a gastrostomy tube. His injury also reactivated and exacerbated a seizure disorder resulting in frequent episodessometimes several per dayin which Samuel stops breathing and must be resuscitated.
The hospital's liability was not an issue at trial. The jury verdict, as reduced by Supreme Court, awarded plaintiff $1,500,000 in past pain and suffering with future damages as follows: $3,000,000 for pain and suffering, $824,900 for equipment, $1,436,590 for medication, $1,619,787 for supplies, $917,016 for medical care, $40,000,000 for nursing care, and $500,000 for therapy after the age of 21.
Supreme Court then structured a future damages judgment as required by CPLR article 50-A. Defendant proposed a structure based on plaintiff's "actual" losses, which would limit plaintiff's total potential recovery to the amounts set out by the jury in its future damages award. Thus, using the award for future nursing care (by far the largest component of future damages) as an example, defendant proposed a structure that would pay $262,800 in the first year, compounding at a rate of 3.335% for 55 yearsthe compensation period fixed by the juryfor a total of $40 million. By contrast, plaintiff proposed a judgment that first made adjustments for litigation expenses and other items pursuant to CPLR 5031 (b) and (c) and then divided the remaining undiscounted award for future nursing *166 care by 55. That quotient, $635,594, would then be used as the first year's award and compounded at a rate of four percent per year for 55 years (see CPLR 5031 [e]).
Supreme Court adopted plaintiff's methodology finding it consistent with our holding in Bryant. The court rejected defendant's proposal, stating it would require rewriting CPLR 5031 (e) and ignoring the decisions of this Court interpreting the statute. The Appellate Division affirmed (294 AD2d 241 [2002]) and certified the following question to this Court: "Was the order of the Supreme Court, as affirmed by this Court, properly made?" We now affirm.

II
This Court has repeatedly and extensively examined the structured judgment provisions of CPLR articles 50-A and 50-B (see Bryant, 93 NY2d 592; Schultz v Harrison Radiator Div. Gen. Motors Corp., 90 NY2d 311 [1997]; Rohring v City of Niagara Falls, 84 NY2d 60 [1994]).[1] Before 1985, future damages were awarded in a lump sum representing the present value of the future damages, payable immediately. With structured *167 judgments, past damages are paid in a lump sum as are the first $250,000 in future damages. Additional future damages after attorneys' fees are paid in monthly installments. The jury is instructed to award the full amount of future damages without reduction to present value (see CPLR 4111 [d]).[2] The term of payment is also dictated by the jury in its itemized verdict; however, payment on awards for future pain and suffering may not exceed 10 years. In order to ensure the availability of funds for these future payments, CPLR 5031 (e) requires purchase of an annuity contract that will make payments in predetermined amounts.
Section 5031 (e) is very specific regarding the procedure for structuring the annuity for future damages in excess of $250,000. After certain adjustments are made to the award, the statute directs that the first annual payment from the annuity is to be calculated "by dividing the remaining amount of future damages by the number of years over which such payments shall be made and the payment due in each succeeding year shall be computed by adding four percent to the previous year's payment" (CPLR 5031 [e] [emphasis added]). Once the court has computed this stream of payments, it determines the present value of the annuity contract "in accordance with generally accepted actuarial practices" (CPLR 5031 [e]).
The widely recognized benefit of structuring is that it allows a defendant's insurer "to retain and invest the balance of the award before the installments come due," thereby reducing overall costs (see Governor's Program Mem, 1985 NY Legis Ann, at 132). Additionally, most of the payments from a structured judgment cease upon an injured plaintiff's death, unlike lump-sum payments which are immediately available and can be invested or spent at the plaintiff's discretion. Thus, from a carrier's economic perspective, the cost of the annuity represents an upper limit of expense, with a significant potential for savings in the event of a plaintiff's early demise.

III
At the outset of our analysis, we note that in the present casebecause of the catastrophic nature of plaintiff's injuries, *168 coupled with a projected life expectancy of 55 yearsthere is a potential dramatic discrepancy between the jury award and an ultimate recovery, assuming plaintiff's survival for more than half a century. With lower awards and shorter durations, the application of article 50-A does not produce such a disparity.
The payout structure defendant proposes makes the jury's award in each category of damages a maximum payment. Working backwards from the jury's award, the first year's payment for each category of losswhich is pivotal here, as all future payments are based on itis determined by reference to the trial evidence. Similarly, the growth rate applied to each successive year's payment is determined by reference to the evidence, selecting a rate that will yield the total amount awarded by the jury at the end of the payment period. The court then calculates a schedule of annual payments that corresponds to the jury's total award, and each year's payment is reduced to present value for purposes of purchasing an annuity.
Defendant illustrates this method with respect to the award for future nursing care. The expert evidence at trial was that plaintiff's nursing care could cost as much as $262,800 in the first year, with an annual "growth rate"the rate at which the cost of care increasesof anywhere from 2.5% to 3.93%, with 3.3% being the national average. Since the jury awarded $40 million over a life expectancy of 55 years, defendant assumes that the jury credited plaintiff's evidence that nursing would cost $262,800 in the first year and reconciled conflicting testimony regarding the growth rate by applying a 3.335% rate, closer to the average 3.3%. Thus, $262,800 compounding at a rate of 3.335% for 55 years equals the jury's figure of $40 million. By contrast, the calculation urged by the plaintiff and applied by the courts below yields a first year payment of $635,594 and compounds that payment by four percent per year, far in excess of the amount required by the evidence, but in compliance with the statutory formula and our precedents.
Defendant admits that its proposed method does not comport with the structuring formula we determined was statutorily required in Bryant.[3] It also ignores the statutory direction to increase annuity payments by four percent annually notwithstanding our ruling that the four percent factor and the jury's *169 consideration of inflation are not mutually exclusive (see Schultz v Harrison Radiator Div. Gen. Motors Corp., 90 NY2d 311). Instead, defendant submits that when a structure calculated with "mechanical" adherence to the requirements of CPLR 5031 (e) results in a judgment that drastically departs from the amount awarded by a jury, a more elastic approach is required. Defendant contends the structured judgment provisions are "administrative schemes intended to regulate and structure payment, and they should not be construed in such a way as to increase the underlying liability owed by defendants" (Rohring v City of Niagara Falls, 84 NY2d 60, 67).[4] Defendant's proposed limits on this departure from the statute are the court's inherent power to do justice, and certain pronouncements of legislative intent derived from statutory history. This argument is unconvincing.
As a general rule of statutory interpretation, application of a statute's clear language should not be ignored in favor of more equivocal evidence of legislative intent. Here the statute is clear that the first year payout under the annuity is to be determined "by dividing the remaining amount of future damages by the number of years over which such payments shall be made," and that the payment for each successive year is to be computed by "adding four percent to the previous year's payment" (CPLR 5031 [e]).
The issues defendant raises on this appeal have, for the most part, already been settled by Bryant and Schultz. As we indicated in Bryant, the most direct way to effectuate the will of the Legislature is to give meaning and force to the words of its statutes (93 NY2d at 602). The first issue addressed in Bryant, the correct method for calculating the first year's payment in a structured judgment, dispositively settles that question here: In order to arrive at the first year's payment, CPLR 5031 *170 (e) mandates that the jury's full undiscounted future damages award for economic losses be divided by the number of years the jury has determined that award to cover. The statute does not require a "per year" breakdown of the jury's verdict or call for assumptions about how the jury arrived at its verdict. Obviously, had the Legislature intended that structured judgments bear such a direct relationship to the jury's verdict, it could have required itemization on a per-year basis or itemization of a specific inflation rate. However, the Legislature amended CPLR 4111 (d), requiring only that juries itemize their verdicts with a category of damages, a total dollar amount and a term of years (L 1985, ch 294, § 6). There is no indication in the history that the Legislature sought to require that the structure exactly match the manner in which the costs accrue. To the contrary, the annuity is meant to make the payments periodic. In the absence of such legislative intent, we decline to ask juries as a matter of course to itemize the basis for their verdict in terms of inflation rates, productivity rates and other factors assumed in reaching a total amount of damages, and to thereby render superfluous the information specifically required under CPLR 4111 (d).
In her concurrence, Judge Read would hold that it was error for the trial court not to grant defendant's request that the jury be instructed to itemize its verdict to include a first year payment figure and a growth rate.[5] She would so hold in order to preserve the possibility that other defendants in future cases *171 might present arguments for alternative structuring methodologies which, unlike that of defendant here, may comport with the language of the statute and legislative intent. Assuming the unlikely premise that a judge could predict in advance of the jury's verdict which judgments will actually require structuring, we note that CPLR 4111 (d) and (f) are specific and comprehensive in defining the information a jury is required to itemize in its special verdict. The statute does not authorize additional itemizations, including calculations used in reaching its future damages award.
The same reasoning applies to the annual increases factored into the annuity structure. Defendant's method for determining a growth rate for the structured judgment amounts to nothing more than applying a rate that will increase payments in such a way as to equal the jury's future damages award in the specified number of years. CPLR 5031 (e) does not authorize this result-oriented process. Moreover, defendant's methodology completely disregards the additional four percent adjustment on structured judgments specifically delineated in the statute. We have already held that the tort reforms of 1985 did not do away with a jury's ability to hear testimony on inflation or apply an interest rate on its future damages awards (see Schultz, 90 NY2d at 317). Thus, in Schultz, we held that a jury may factor an inflationary rate in its future damages verdict, even though the trial court must apply the four percent required in CPLR 5031 (e).[6] Again, the close linkage between the jury's reasoning and the eventual structured judgment advocated by defendant is not required by the language of the statute or supported by the legislative history.
At this point in our experience with the CPLR structuring provisions, we cannot perceive any proposed methodology that *172 excludes either the jury's calculation of a growth factor or the statutes' requirement of an annual four percent additur that would not run afoul of the clear statutory language or our holding in Schultz. Our well-established rules of statutory construction prevent us from looking behind the unambiguous language of a statute unless an absurd result would obtain from its application (see Doctors Council v New York City Employees' Retirement Sys., 71 NY2d 669, 674-675 [1988]). Literal application of these statutes does not produce an absurd result. The absurdity that Judge Read perceives stems from her conviction that the current structuring methodology double counts for inflationa conclusion based wholly on her disagreement with Schultz. Moreover, even assuming some ambiguity in the statutory language, it simply cannot be said with any degree of certainty that this is not the structuring methodology the Legislature intended.
The Attorney General, as intervenor and amicus, contends that the phrase "determined in accordance with generally accepted actuarial practices" in CPLR 5031 (e) creates an ambiguity in that the structured judgment arrived at under this section does not appear to comport with settled economic rules concerning the time value of money. However, it is clear from a reading of the statute that the phrase "generally accepted actuarial practices" refers to selection of the discount rate used to reduce the structured judgment to present value. A fair reading of that phrase in its context does not give the court the power to review and rewrite the entirety of a structured judgment to conform to economic doctrines.

IV
Defendant would have us view the multifaceted features of the 1985 act as intended for a single purpose: the reduction of costs for medical malpractice carriers. However, the structured judgment provisions, along with the other reforms passed in 1985, represent a weighing and balancing of many interests including those of doctors, patients, malpractice victims, consumers, liability carriers and taxpayers.
Bryant recognized that the structured judgment statutes were intended to serve the dual purpose of "[moderating] the cost of medical malpractice premiums, while assuring adequate and fair compensation for injured persons" (Governor's Program Mem, 1985 NY Legis Ann, at 132; see also Bryant, 93 NY2d at 600). Indeed, the entirety of the numerous provisions in chapter 294 of the Laws of 1985 represents concessions from *173 all sides for the purpose of maintaining the availability of medical liability insurance.[7] By spreading payments over time and structuring benefits, plaintiffs have greater assurance that funds will be available for future needs as they arise. Counterbalancing that benefit, however, plaintiffs lost the opportunity to receive a lump-sum payment and seek their own rate of returnone possible justification for the four percent additur in CPLR 5031 (e) (see Schultz, 90 NY2d at 319). Likewise, while interest on earnings from a lump-sum payment are taxable, annual payments from a structured judgment are not another benefit to plaintiffs. However, defendants are relieved of the obligation to pay most future damages from structured judgments upon the injured plaintiff's death, a source of savings to carriers who purchase annuities at substandard underwriting rates based on actuarial life expectancies (see CPLR 5035). The extensive debates in the State Assembly and Senate reflect the myriad interests and concerns that went into creating a legislative package that weighed interests on all sides, as opposed to conferring a unilateral benefit on the liability insurance industry.
Although it appears that, should he survive for 55 years, plaintiff would ultimately be paid more than the jury award, that alone is not enough to disregard the specified statutory procedure. The Legislature weighed competing interests and arrived at a methodology, an unequivocal directive we will not ignore or rewrite.

V
Finally, it is noteworthy that this Court unanimously affirms the order of the Appellate Division upholding the judgment, and does so convinced that we are inescapably led to that conclusion by the clear direction of article 50-A in this case. We are, moreover, unanimous in urging the Legislatureas we have done beforeto revisit the statute to determine whether, in actual operation, it is achieving its intended purposes, or indeed overcompensating plaintiffs.
It is more than 18 years since enactment of article 50-A, and there have by now likely been hundreds of awards structured pursuant to the statute. While this Court is bound by the record and the responsibility to implement clear statutory directives, *174 the Legislature can take a broader view, examining the range of other cases, eliciting the views of the various segments of affected, critically interested communities, and investigating and anticipating the full impact of any necessary amendments, whether to article 50-A, to CPLR 4111 or to other statutory sections.
We have examined defendant's remaining arguments that the structuring statute violates due process and, as applied, creates an unconstitutional taking, and conclude they are without merit.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question not answered upon the ground that the Appellate Division order is final and thus the certified question is unnecessary.
ROSENBLATT, J. (concurring).
Although the parties have not indicated whether the jury's $50 million total verdict is among the highest ever awarded in a negligence case, it is surely among the higher personal injury verdicts in our state's history. There is no denying the heartbreaking nature of Samuel's injuries, and the jury was understandably impressed by the moving and abundant proof as to how he will have to live over the course of his life.
Based on the expert testimony at trial, the jury calculated that in light of his condition Samuel would be expected to live for another 55 years. In arriving at a figure of $50 million for his care, the jury, as instructed, took into account the projected impact of inflation. Put differently, the jury concluded, in effect, that if there were no inflation it would take roughly $12 million to "compensate" for the expected loss. (I say "compensate" in the legal sense. To the minds of most people, there is no amount of money that can compensate for these injuries.) By adding the inflation factor (ostensibly 3.335%), the jury arrived at the sum of $50 million.
I write separately to point out that although the jury determined that $50 million is the apt figure after inflation, CPLR article 50-A comes into play and further enlarges the judgmentnearly threefoldto approximately $140 million. It is difficult to imagine that the jury would have awarded $12 million and extrapolated it to $50 million (by taking into account the projected inflation factor) if it knew that the verdict would actually amount to a payout of about $140 million. It is equally difficult to imagine that the Legislature could have *175 easily predicted that article 50-A (as later interpreted[*]) would lead to this extraordinary level of compensation. And yet that is what the statute seems to require for all cases like the one before us.
This appeal tests the separation of powers doctrine to its limits. It would have been easy enough for a less dutiful court to ignore the words of the statute and apply its own methodology, reasoning that the Legislature could not possibly have intended this result. The Court, however, has not done that. Instead, and commendably, it applies article 50-A out of fidelity to the literal legislative language. I concur because the result (when the statute is read in combination with Schultz and Bryant) seems inescapable. Once Schultz held that the four percent additur was to be calculated on top of the jury's projected rate of inflation, the die was cast. From that point, structured judgments took on the prospect of damage awards in excess of plaintiffs' damages. The case before us, however, dramatically demonstrates the ultimate and extreme consequences that may well have been beyond the Legislature's intentions. Unless the Legislature amends the statute, awards will be comparably enlarged in all personal injury cases of this type.
When jury awards are substantially lower than here, the application of article 50-A does not result in this degree of expansion. By the unstinting application of article 50-A, the effects of the structured judgment provisions will be most keenly feltand will produce the levels of payouts we have here when applied to verdicts that award plaintiffs millions of dollars. This will happen because article 50-A requires that the average annual award, in future dollars, be taken as the first year's calculation (see Bryant, 93 NY2d at 603-604). It thus gives plaintiffs the benefit of inflation in year one, where the actual effects of inflation are necessarily at their lowest. Furthermore, the statute compounds this by seemingly requiring the addition of yet another four percent to the already ballooned initial figure (see Schultz, 90 NY2d at 319-320). Resultingly, a plaintiff with injuries declared to be worth $12 million is to be paid $140 million.
The Attorney General of the State of New York and the New York City Corporation Counsel call this unpalatable. They implore the Court to read the statute in a way that will avert *176 what they characterize as systematic and extensive overcompensation involving payouts that run into the hundreds of millions of dollars.
By way of amicus, the Attorney General asks us to reject plaintiff's position because, like the City, the State is sued in thousands of personal injury and wrongful death actions each year, and because "the State has an interest in ensuring that medical malpractice insurance premiums do not increase to a level that might impair its citizens' access to affordable, high-quality medical care." Quoting Rohring v City of Niagara Falls (84 NY2d 60, 67 [1994]), the State argues that "[p]laintiffs are entitled to be made whole * * * but have no right to overcompensation," i.e., compensation for expected losses "well in excess of plaintiffs' actual losses."
The Attorney General candidly tells us that a literal reading of the key statutory provision supports plaintiffs' interpretation, but argues that the $140 million result would frustrate the legislative purpose, which is to compensate adequately, not to triple a verdict that cannot by any measure be considered inadequate at $50 million.
The City is no less forceful in its thrust. It importunes the Court to repudiate the methodology that has produced this judgment because it places "an unwarranted financial burden on tort defendants, such as the City, HHC, and New York Hospital." The City terms the methodology unconscionable, because it "grossly overcompensates plaintiffs rather than awarding actual proven losses with reasonable allowances for time" and that "[b]ecause of such overcompensation, insurance companies charge high fees for annuity contracts to fund structured judgments." According to the City and the State, the operation of the statute defeats one of its primary purposeswhich was to reduce rather than increase insurance costs.
The City illustrates this point by listing a number of cases in which large verdicts have been rendered against it (and its Health and Hospitals Corporation), and argues that the strict application of article 50-A will carry serious financial consequences in the form of increasingly greater and unprecedented payouts in tort cases.
Potent as these arguments may be, they ask too much of us. As judges, it is not for us to pick up the legislative pen and rewrite the statute. Given the landscape before us, it is for the Legislature, and not the Court, to act on these grievances if it *177 sees fit, knowing now what it could not have readily forecast when it enacted the measure.
The City and State have made cogent assertions, contending that the Legislature did not likely conceive of a result so far out of line with accepted standards of compensation. The Legislature is best suited to vindicate that position. This is the most efficient approach and the one most faithful to our respective roles and duties.
READ, J. (concurring).
I agree with defendant New York Hospital that the trial court erred in denying a request to instruct the jury to set forth its factual determinations as to the starting figure and growth rate for each category of future damages. The denial was not reversible error in this case, however, because the only purpose for which defendant requested these factual determinations was to allow the trial court to apply a proposed structuring methodology that sidesteps two clear statutory directions in the structured judgment statutes (CPLR article 50-A and its cognate, article 50-B) applicable to calculation of the annuity for future damages i.e., to divide by the number of years for which the factfinder awarded payment of these future damages (but no more than 10 years in the case of damages for future pain and suffering) and to compound by 4% for the same number of years. While I thus agree with the majority on the impermissibility of the structuring methodology proposed by defendant here, I am unable to subscribe to its broader analysis.

I.
By turns opaque and prescriptive, CPLR 5031 and 5041 test the limits of the techniques for statutory interpretation. In three principal cases, we have deployed the familiar tools of the trade (language, context, intent or purpose, legislative history, bearing of related provisions) to fill in statutory gaps as necessary to decide discrete issues related to the structuring methodology.
In Rohring v City of Niagara Falls (84 NY2d 60 [1994]), we addressed the payment of attorneys' fees attributable to the future damages award. The specific question posed was whether the present value of these attorneys' fees should be subtracted from the present or the gross (i.e., undiscounted) value of the future damages subject to structuring. Finding inadequate interpretive guidance in the statutory language which we labelled "circular," "patently ambiguous" and "impossible *178 to apply as written" (id. at 67)we turned to legislative intent or purpose.
We characterized articles 50-A and 50-B as intended by the Legislature to be "technical administrative schemes * * * to regulate and structure payment [which] should not be construed in such a way as to increase the underlying liability owed by defendants," so that "[p]laintiffs are entitled to be made whole, as determined by the trier of fact, but have no right to overcompensation" (id.). With this legislative intent as our polestar, we concluded that the proper structuring methodology was to determine the present value of future damages before attorneys' fees and then to reduce this amount by the present value of attorneys' fees. We noted that use of the alternative methodology proposed would result in a combined payment to plaintiff and plaintiff's counsel exceeding the amount awarded by the jury, a "result * * * inconsistent with the purposes of articles 50-A and 50-B" (id. at 68).
In Schultz v Harrison Radiator Div. Gen. Motors Corp. (90 NY2d 311 [1997]), defendant argued that the factfinder could not consider any evidence of inflation because the 4% annual, compounded increase in future payments called for by CPLR 5041 (e) was the exclusive proxy for inflation in a future damages award subject to the statute. Thus, we framed the issue as "whether CPLR 5041 (e) precludes the plaintiff from presenting evidence of inflation at trial" (id. at 315), and decided that it did not.
In reaching this conclusion, we noted that prior to article 50-B's enactment, juries were permitted to consider expert testimony relating to inflation in reaching verdicts, and that nothing in CPLR 5041 explicitly abrogated this common-law rule. We also observed that CPLR 4111 (f), enacted along with article 50-B to facilitate its implementation, called for the jury in a personal injury case to "be instructed to award the full amount of future damages, as calculated, without reduction to present value" (id. at 317 [emphasis added]). We interpreted the modifier "full" to denote an amount reflecting inflation. Moreover, we were concerned that the exclusion of evidence of inflation might disadvantage plaintiffs who ultimately recover less than $250,000 in future damages, the threshold for structuring, or at least complicate the jury charge.
Because the purpose of the 4% increase was "not evident from the face of the statute" (id.)indeed, the structured judgment statutes and CPLR 4111 (d) and (f) are both silent on the *179 issuewe also searched legislative history for the underlying intent or purpose. There we found that the Governor, in an early version of article 50-A, had identified the statutory percentage increase in CPLR 5031 (e) (initially 5%) as an "inflation factor" (id.). Moreover, items in the Bill Jackets for both articles 50-A and 50-B reflected a consistent contemporaneous understanding that these increases were meant to account for inflation. We noted, however, that "nothing in any of the legislative history indicates that the 4% rate was intended to be the exclusive measure of inflation or that the fact finder should be prohibited from considering the effects of inflation in reaching a damages award" (id. at 318 [emphasis in original]).
While recognizing that "statements of legislators made during legislative debates are not dispositive of legislative intent" (id.), we also considered comments made by Assembly Member Melvin Miller during debate on the bill containing provisions subsequently enacted as article 50-A. He expressed his belief that any verdict rendered by a jury would reflect inflation prior to the trial court's reduction of it to present value and the addition of the 4% increase compounded annually (id.).[1]
The only evidence that we marshalled to substantiate that the 4% increase was meant to compensate for something other than inflation was an excerpt from the Governor's Approval Memorandum for article 50-B. This passage described article 50-B as "authoriz[ing] periodic payments of future damages over $250,000, in equal installments over the period of years determined by the trier effect [sic] but not more than 10 years, with a 4% interest factor computed on the prior year's payment" (Governor's Mem approving L 1986, ch 682, 1986 McKinney's Session Laws of NY, at 3184 [emphasis added]). Of course, the only future damages limited to a 10-year payout under the structured judgment statutes are those for pain and suffering. Under New York common law, future damages for pain and sufferinglike other future damageswere paid in a lump sum, butunlike other future damageswere neither augmented for inflation nor discounted (see e.g. Matter of McKenna v State of New York, 112 AD2d 996, 998 [2d Dept 1985]; Jacobs v Peress, 24 AD2d 746 [1st Dept 1965]). Hence, the description *180 of the 4% increase in relation to future damages for pain and suffering as an "interest factor" rather than as an "inflation factor" makes sense in context and does not suggest that the 4% was intended or understood to compensate for something other than inflation for other categories of future damages, such as future medical costs or future lost earnings.
Finally, Bryant v New York City Health & Hosps. Corp. (93 NY2d 592 [1999]) called on us to answer two more methodological questions: whether future damages awards made by annual payments are properly calculated according to future value or present value; and whether the 4% should be included in the award prior to determining attorneys' fees (id. at 598). We concluded that the trial court should include the 4% increase, compounded annually, before reducing the future damages award to present value and calculating the attorneys' fees (id. at 604).
Looking first to the language of the structured judgment statutes and CPLR 4111 (f), we pointed out that these provisions consistently refer to "future damages" and the "full amount" of such damages (id. at 602-603 [emphasis omitted]). We reiterated the observation in Schultz that an "inflation adjustment" in an award simply protects against erosion of its value over time (id. at 603). We cautioned that "use of the present value of future damages as the basis for the annual payments would be at odds with Schultz, as it would for all intents and purposes extract the jury's inflation adjustment from the plaintiff's award" and that "[n]othing in the statutes' language supports this unintended result," which would undermine the statutes' compensatory goal (id.). Finally, we found support for our position in the language of related statutory provisions (id. at 604, citing CPLR 4111 [f] [the jury shall "be instructed to award the full amount of future damages, as calculated, without reduction to present value"]; CPLR 5034, 5044 [directing that upon granting a judgment creditor's petition for a lump-sum payment after default, the remaining annuity contract payments shall not be converted to present value]; and CPLR 5035 [b]; 5045 [b] [authorizing conversion of periodic installments allocable to loss of future earnings to present value and payment of them as a lump sum upon the judgment creditor's death]).
To answer the methodological question about the calculation of attorneys' fees, we relied principally on the statutory language (i.e., CPLR 5031 [e]; 5041 [e] [requiring the annuity contract to provide for "payment of the annual payments," *181 which include the 4%]). We also reasoned that attorneys' fees are generally based on a plaintiff's overall recovery (Bryant, 93 NY2d at 604-605).

II.
As the foregoing Cook's tour of our previous encounters with CPLR articles 50-A and 50-B illustrates, we have applied legitimate techniques and tools to deal with the maddening ambiguities and silences in these statutes. But in doing so we have inevitably made choices and those choices have added our interpretive gloss to the Legislature's handiwork.
Like Judge Rosenblatt, I find it "difficult to imagine that the Legislature could have easily predicted that article 50-A (as later interpreted) would lead to this extraordinary level of compensation" (concurring op at 174-175) in a case such as this, or that this consequenceawards greatly exceeding the future damages found by the factfinderwas ever intended. Articles 50-A and 50-B were, as the majority points out, part of a complex tort reform package, a legislative compromise the full contours of which are unknowable. Nonetheless, as we acknowledged in Rohring, the structuring methodology is supposed to regulate and structure payment, not to increase the underlying liability.
Commentators who have parsed (and criticized) the mathematics of the structured judgment statutes[2] have suggested that much of this disparity between the future damages as determined by the factfinder and as calculated for the annuity results from taking a jury verdict reflecting inflation and then increasing it by 4% compounded annually. This particular approach was introduced into the interpretive mix relatively early on by the Fourth Department in Brown v State of New York *182 (184 AD2d 126 [1992]), a case in which we denied leave to appeal (81 NY2d 711 [1993]).[3] When we finally considered the issue in Schultz, we decided that CPLR 5041 (e) does not preclude the plaintiff from presenting evidence of inflation at trial because the 4% increase is not the sole or exclusive measure of it.
In my view, it does not ineluctably follow that the inflation and/or productivity growth rates determined by the factfinder for future medical costs or earnings and the 4% increase are additive. To the extent that Schultz holds otherwise (my colleagues' view), that conclusion must rest on the proposition that the 4% increase represents something other than inflation. This proposition finds no support in statutory language (CPLR 5031 and 5041 are silent as to the purpose of the 4% increase) and is contrary to both the Governor's characterization of the statutory increase in his program bill on which article 50-A was based and the consistent contemporaneous understanding that the 4% increase was designed to account for inflation.
The evidence that we cited in Schultz to support this proposition was the previously quoted statement made in the Governor's Approval Memorandum for article 50-B, which was limited in scope to future damages paid out over 10 years; i.e., future damages for pain and suffering. We also suggested in Schultz (and plaintiff argues here) that the 4% increase might have been intended to compensate plaintiffs for "the loss of investment potential * * * or to offset other substantial economic advantages afforded to defendants (such as allowing defendants to pay out less money, to be invested over time to create plaintiff's damage award)" (90 NY2d at 319). Structuring of judgments was expressly designed, however, to allocate to the defendant, not the plaintiff, the potential for money when invested over time to yield returns over and above inflation. Any such cost savings accruing to the defendant as a result would obviously be lost if, at the same time, the defendant was required to compensate the plaintiff for the loss of this investment potential. This is especially the case because *183 the structured judgment statutes require the defendant, not the plaintiff, to assume the investment risk; i.e., the plaintiff is guaranteed payment of the annuity regardless of how the defendant's investments fare.
Viewing our decisions construing CPLR 5031 and 5041 with the gift of hindsight, I conclude that Schultz, read in conjunction with Bryant, created a double-counting for inflation in the annuity not called for by the structured judgment statutes' language. This double-counting is fundamentally at odds with the statutory purpose and predictably produces absurd results in cases (such as this one) where substantial nonearnings or earnings losses are payable by an annuity over many years or decades. We have in the past adjusted methodologies that double-counted in the computation of future damages awards (see Love v State of New York, 78 NY2d 540 [1991]; Milbrandt v Green Refractories Co., 79 NY2d 26 [1992]). Accordingly, I would revisit Schultz to eliminate the double-counting notwithstanding my recognition of the important (and, in my view, usually overriding) principle of stare decisis.
For example, defendant in this case has inferred that the jury applied an inflation rate of 3.335% for future nursing care by taking the maximum possible annual cost supported by the evidence ($262,800) and determining what percentage increases this amount to $40 million over 55 years as awarded by the jury. Assuming the same figures in a future case where the jury has been instructed to make the requisite findings, the trial court might simply back out the 3.335% from the jury's full (i.e., undiscounted) future damages award to avoid double-counting when the 4% increase is applied to calculate the annuity. This would result in a future value for the annuity of $50 million rather than $120 million ($262,800 × 55 = $14,454,000 divided by 55 = $262,800 compounded by 4% for 55 years = $50 million). In a case in which the jury found an inflation rate exceeding 4%, the approach employed in Pay (see n 3, supra at 182) would protect the plaintiff's award from erosion by these higher rates of inflation. In essence, 4% is the statutory floor for inflation.
I find nothing in the language of CPLR 5031 and 5041 to preclude a trial court from carrying out such an adjustment, which would, in fact, always compensate the plaintiff for more than the full amount of the future damages as determined by the factfinder without producing an absurdly disproportionate future damages award. Of course, the trial court must know the starting figure and/or the inflation rate for each category of *184 future damages in order to eliminate double-counting in this way.
These factual determinations are a prerequisite for any future damages award reflecting inflation; therefore, the factfinder must always determine these components of a future damages award and a trial judge sitting without a jury must also always express and explain them. A jury, however, need not state these factual components without an instruction, which the majority argues that CPLR 4111 (d) and (f) prohibit.
As an initial matter, these provisions direct the jury to fix the "full amount of future damages, as calculated, without reduction to present value." This is a broad statement and, as previously noted, in order to determine the "full amount" which we read in Schultz to mean damages adjusted to reflect inflationthe jury must necessarily settle on a starting figure and an inflation rate. In addition, the specific direction for the jury to set forth the "full amount" and the period of years "over which such amounts are intended to provide compensation" does not forbid a more detailed instruction.
In short, I would read CPLR 4111 (d) and (f) to permit the jury to be asked to set forth any factual determination necessarily underlying the future damages award and not expressly prohibited by the statute (as reduction to present value is). Having allowed the jury to consider inflation notwithstanding statutory silence I find it inconsistent to preclude the defendant from discovering what the jury decided in this regard because of statutory silence.

III.
This case poses two discrete questions: whether the defendant was entitled to the requested jury instruction and whether the defendant's proposed structuring methodology passes muster under CPLR article 50-A. I would answer the first question "Yes" and the second "No." Thus, because the failure to permit the jury instruction was not reversible error in this instance, I would affirm the Appellate Division's order. Finally, I join with my colleagues in urging the Legislature to reexamine the structured judgment statutes to consider whether these important provisions serve their intended purpose in a coherent and equitable way.
*185 Order affirmed, with costs. Certified question not answered upon the ground that the Appellate Division order is final and thus the certified question is unnecessary.
NOTES
[1] CPLR 5031 (e) provides: "(e) With respect to awards of future damages in excess of two hundred fifty thousand dollars in an action to recover damages for dental, medical or podiatric malpractice, the court shall enter judgment as follows:

"After making any adjustments prescribed by subdivisions (b), (c) and (d) of this section, the court shall enter a judgment for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments. The present value of such contract shall be determined in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages, as calculated pursuant to this subdivision. The period of time over which such periodic payments shall be made and the period of time used to calculate the present value of the annuity contract shall be the period of years determined by the trier of fact in arriving at the itemized verdict; provided, however, that the period of time over which such periodic payments shall be made and the period of time used to calculate the present value for damages attributable to pain and suffering shall be ten years or the period of time determined by the trier of fact, whichever is less. The court, as part of its judgment, shall direct that the defendants and their insurance carriers shall be required to offer and to guarantee the purchase and payment of such an annuity contract. Such annuity contract shall provide for the payment of the annual payments of such remaining future damages over the period of time determined pursuant to this subdivision. The annual payment for the first year shall be calculated by dividing the remaining amount of future damages by the number of years over which such payments shall be made and the payment due in each succeeding year shall be computed by adding four percent to the previous year's payment."
[2] CPLR 4111 (d) provides: "In itemizing amounts intended to compensate for future damages, the jury shall set forth the period of years over which such amounts are intended to provide compensation. In actions in which article fifty-A or fifty-B of this chapter applies, in computing said damages, the jury shall be instructed to award the full amount of future damages, as calculated, without reduction to present value."
[3] Under defendant's methodology, the total amount of future payments can never be greater than the jury's award. As a result, the value of the annuity to be purchased will always be equal to the present value of the jury's future damages award, although the cost might be less. In essence, this methodology, which simply requires reducing the jury's future damages award to present value for purposes of purchasing an annuity, is actually a variant of the proposed methodology we rejected in Bryant.
[4] From a mathematical standpoint, defendant's reasoning could mean that any structured judgment paid in its entirety will run afoul of legislative intent because the same calculations that cause the full-term judgment payout to exceed the jury verdict in this case are performed in every structuring situation, albeit often with less dramatic results. The pronounced discrepancy between the jury award and judgment amount here is the result of the catastrophic nature of plaintiff's injuries coupled with a relatively long life expectancy. However, the phenomenon defendant complains of is not unique to this case (see Lambrinos and Harmon, 1995 Legal Development, Plaintiff Bias in the CPLR 50-A/50-B Statutes, 59 Alb L Rev 693 [1995]).
[5] Without identifying an ambiguity in "clear statutory directions" (Read, J., concurring op at 177), Judge Read would impose additional conditions on the statutory scheme. She does so in the belief that despite the statute's clarity in this respect, its execution is "fundamentally at odds with [its] purpose" (Read, J., concurring op at 183) even though she concludes, as we all do, that the statute is only one "part of a complex tort reform package, a legislative compromise the full contours of which are unknowable" (Read, J., concurring op at 181).

The statute directs that the first annuity payment of the judgment is "calculated by dividing the remaining amount of future damages by the number of years over which such payments shall be made and the payment due in each succeeding year shall be computed by adding four percent to the previous year's payment" (CPLR 5031 [e]). The jury's verdict pursuant to CPLR 4111 is the total amount of future damages in accordance with the plaintiff's life expectancy. Judge Read's view is that CPLR 4111 should be read (or perhaps amended) to require each future damages calculation be specifically itemized with a rate of inflation, productivity rate or other growth factor. Then she would require that the court recalculate the damages award with the four percent as a guaranteed rate of inflation. This might make sense if the four percent could only be understood as a default inflation figure. However, we rejected that proposition in Schultz. Judge Read's new statutory directive would require the remaining amount of future damages to be reduced to present value by recalculating the jury's award using its rate of inflation (and any other growth factors found by the court or the jury). That amount would be multiplied by a plaintiff's life expectancy, then divided by that figure and compounded annually by at least four percent for a period equal to a plaintiff's life expectancy (see Read, J., concurring op at 183). Such rewriting of the statuteif required, and desiredcan only be accomplished by the Legislature, not the Court.
[6] Contrary to Judge Read's suggestion, the rule in Schultz did not emerge from statutory silence (see Read, J., concurring op at 184). It was formed, in part, from our view that CPLR 4111 and the structured judgment statutes did not abrogate the longstanding common-law rule that juries could consider inflation in calculating future damages. Judge Read's proposed rule, however, requiring juries to provide additional itemization, has neither a history rooted in the common law nor legislative authorization.
[7] Judge Read is in error in stating that the basis for this conclusion is simply the Governor's Approval Memorandum (see Read, J., concurring op at 182).
[*] See Bryant v New York City Health & Hosps. Corp. (93 NY2d 592 [1999]); Schultz v Harrison Radiator Div. Gen. Motors Corp. (90 NY2d 311 [1997]).
[1] Thus, Assembly Member Miller seemed to assume that the trial court would employ the "double discounting" methodology that we later rejected in Bryant v New York City Health & Hosps. Corp. (93 NY2d 592 [1999]). As we noted in that case, discussed later in the text, this methodology "would for all intents and purposes extract the jury's inflation adjustment from the plaintiff's award" (id. at 603).
[2] S. Argentine, From Verdict to Judgment: The Evolution, Confusion and Reformation of CPLR Articles 50-A and 50-B, 40 Buff L Rev 917 (1992); J. Lambrinos and O. Harmon, 1995 Legal Development, Plaintiff Bias in the CPLR 50-A/50-B Statutes, 59 Alb L Rev 693 (1995); M. Wolkoff and E. Hanushek, The Economics of Structured Judgments Under CPLR Article 50-B, 43 Buff L Rev 563 (1995); P. McKenna, A Four Percent Solution to the "Judge's Nightmare," 67 NY St B J 44 (Jan. 1995); A. Riccardi, A Reply to Professors Wolkoff & Hanushek on the Economics of Structured Judgments Under CPLR Article 50-B, 44 Buff L Rev 991 (1996); L. Spizman and E. Schmitt, Unintended Consequences of Tort Reform: Rent Seeking in New York State's Structured Settlements Statutes, 13 J Forensic Econ [No. 1] 29-48 [2000]; A. Riccardi and T. Ireland, Structured Judgments and Periodic Payments in New York: A Unique and Complex System for Tort Awards, 10 J Legal Econ 55 (2000).
[3] In Rohring and Pay v State of New York (87 NY2d 1011 [1996]), both of which also originated in the Fourth Department, we did not reach any question related to treatment of the 4% increase because the issue had not been preserved. Interestingly, Pay was tried to a judge, not a jury and so the trial court was obligated to set forth the starting figure and inflationary growth rate for future medical costs. The trial court in Pay found that the average rate of future medical inflation was 7.12% and therefore initially increased the award for medical damages by 3% a year, having subtracted the 4% to be added later under CPLR 5041 (e) to determine the annuity.